NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0679n.06

No. 15-5863

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Dec 15, 2016
DEBORAH S. HUNT, Clerk

JOSEPH SHAHEEN, Ancillary Administrator of the )
Estate of Nadia Shaheen, deceased,                )
                                                  )
          Plaintiff-Appellant,                    )
                                                  )
          v.                                      )        ON APPEAL FROM THE
                                                  )        UNITED STATES DISTRICT
                                                  )        COURT FOR THE WESTERN
PROGRESSIVE CASUALTY INSURANCE                    )        DISTRICT OF KENTUCKY
COMPANY,                                          )
                                                  )
          Defendant-Appellee.                     )

BEFORE: McKEAGUE, GRIFFIN, and KETHLEDGE, Circuit Judges.

GRIFFIN, Circuit Judge.

In this action brought under Kentucky law, plaintiff Joseph Shaheen argues defendant Progressive Casualty Insurance Company ("Progressive") acted in bad faith by conditioning its offer to pay a $250,000 policy limit for bodily injury on plaintiff's agreement to release and indemnify its insured. The district court granted summary judgment in favor of Progressive on the ground that plaintiff did not create a genuine dispute of material fact as to whether defendant's conduct constituted bad faith in violation of Kentucky's Unfair Claims Settlement Practices Act ("KUCSPA"), Ky. Rev. Stat. § 304.12–230. Finding no reversible error, we affirm.

I.

This action is a subplot within a larger story. On November 11, 2005, Burgess Harrison Yonts struck and killed pedestrian Nadia Shaheen. Yonts was intoxicated and fled the scene without rendering aid. That night, Yonts was driving a vehicle insured by defendant Progressive under Yonts's parents' auto insurance policy. Yonts was a covered driver, and the policy provided up to $250,000 in coverage for bodily injury per person.

Yonts was arrested on November 12, 2005, and denied any connection to the accident. Progressive then began its own investigation in an attempt to identify the vehicle and driver involved. Dorit Jones was the assigned claims representative under the management of Charles Nesselrodt in the Large Loss Unit. The criminal investigation complicated Progressive's own inquiry into the circumstances of the accident regarding access to evidence, such as the vehicle, and witnesses, including the insured.

Plaintiff filed a wrongful death suit on October 17, 2006 against Yonts, his fraternity, and several individual fraternity members. He also filed a dram shop action against a bar that served Yonts alcohol on the night of the accident. As the criminal trial approached, Progressive had not yet definitively identified Yonts as the driver because Yonts maintained he was not driving the vehicle on the night in question, and no one Progressive interviewed could establish that he was involved in the accident. A Kentucky jury thought otherwise and convicted Yonts on February 1, 2007, of wanton murder, driving under the influence, leaving the scene of an accident, and tampering with evidence. He was sentenced to 20 years in prison, but the Governor of Kentucky later commuted that sentence.

For Jones, the verdict conclusively established that Yonts was the person "responsible behind the wheel, which had never been demonstrated" in her investigation. Even though the

conviction was appealed, Jones recommended evaluating and resolving plaintiff's claim in light of the verdict. Accordingly, Progressive began internal discussions regarding whether to extend an offer to plaintiff in exchange for a full release of all claims against its insured. Defendant was skeptical, however, that plaintiff would agree to a full release and indemnification given his pending claims against the fraternity, several of its members, and the bar.

In a demand letter dated March 20, 2007, plaintiff's counsel acknowledged receiving a declaration page for the Yonts family's auto insurance policy revealing $250,000 in coverage for Shaheen's death. Plaintiff's counsel asserted that "[t]he direct economic loss to [Shaheen's] estate exceeds the coverage limit" and asked Progressive "to make its prompt and unconditional payment of its full coverage" to plaintiff and his attorneys. In response, Progressive evaluated its negotiating position and decided to offer plaintiff the full policy limit in exchange for a release and indemnification to protect its insured.

Once authorization to settle for the policy limit was granted on April 9, 2007, Progressive opted to make plaintiff the offer through Yonts's defense attorney. The defense attorney communicated Progressive's offer and terms in a letter dated April 18, 2007. Plaintiff responded on April 27, 2007, reiterating that his demand was "for the prompt and **unconditional** payment of" the policy limits. (Bold in original.) According to plaintiff's counsel, "it is unreasonable for Mr. Yonts to expect to be released merely because he has elected to purchase insufficient coverage to satisfy his own liability." In response, Progressive held its offer open, while plaintiff pursued his civil action against multiple defendants. As plaintiff's civil action progressed, Progressive periodically reviewed and updated its claim file but no further progress concerning settlement was made. Progressive was anticipating multiple cross claims against Yonts and

viewed the ongoing civil litigation and Yonts's criminal appeals as impediments to resolving the claim.

On March 4, 2008, plaintiff filed a complaint against Progressive alleging that the insurer violated the KUCSPA by failing to respond to the April 27 demand letter and refusing to unconditionally pay plaintiff $250,000. Progressive, through Yonts's defense lawyer, reminded plaintiff's counsel in a letter dated May 29, 2008, that it was still willing to offer the policy limits in exchange for a release. Yonts's lawyer told plaintiff's counsel to "let [him] know" if he was "in a position to discuss and/or accept same." Plaintiff's counsel responded on June 5, 2008, noting that settlement in the wrongful death action would not "be possible unless a substantial contribution is made . . . above policy limits."

In early 2009, plaintiff's civil action moved forward. First, summary judgment was granted in favor of the fraternity and the individual fraternity members. Plaintiff then settled his dram shop claim against the bar for $100,000, leaving Yonts as the only remaining defendant. In March 2009, Progressive was made aware of a "possible move" towards resolution that would include a personal contribution from Yonts or his parents. Yonts's father indicated his willingness to contribute in order to resolve the case, but noted that his personal funds were limited.

On April 28, 2009, plaintiff proposed a settlement package including the $250,000 policy limit payment and a $100,000 payment from Yonts's parents in exchange for a covenant not to collect against Yonts. Yonts's father told defense counsel that Yonts wanted to resolve the civil suit. Progressive reviewed the proposal on May 1, 2009, and concluded it was a reasonable resolution. Yonts executed the covenant on May 6, 2009, and Progressive issued a $250,000 check to Shaheen's estate on June 26, 2009.

Although Progressive paid the policy limits, plaintiff still pursued his third-party statutory bad faith claim against the insurer. After a lengthy discovery period, Progressive moved for summary judgment in early 2015. Plaintiff opposed, arguing that defendant had violated subsections 3, 4, 6, and 14 of the KUCSPA. The district court granted summary judgment in favor of Progressive, ruling that plaintiff did not establish a genuine dispute of material fact as to whether the insurer's actions rose to the level of bad faith under Kentucky law. Plaintiff appeals.

## II.

We review a district court's grant of summary judgment de novo. *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). Although Kentucky substantive law applies here pursuant to *Erie R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938), "a federal court sitting in diversity uses the federal standard for summary judgment." *Tompkins v. Crown Corr, Inc.*, 726 F.3d 830, 837 n.4 (6th Cir. 2013). Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

When considering whether to grant summary judgment, all reasonable inferences must be made in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "not every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The central issue, therefore, is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

III.

Kentucky recognizes third-party statutory bad faith claims against insurers under the KUCSPA. *State Farm Mut. Auto. Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988). But, the threshold standard for stating such a claim is "high indeed." *United Servs. Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003). In general, the KUCSPA "is intended 'to protect the public from unfair trade practices and fraud' and 'imposes what is generally known as the duty of good faith and fair dealing owed by an insurer to an insured[.]'" *Phelps v. State Farm Mutual Auto. Ins. Co.*, 736 F.3d 697, 703 (6th Cir. 2012) (citations omitted). The statute fundamentally requires that "a good faith attempt be made to effectuate a prompt, fair and equitable settlement[.]" *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 454 (Ky. 1999). The KUCSPA applies during litigation. *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 517 (Ky. 2006). Thus, under Kentucky law, an insurer owes a duty of good faith both to the insured and to the party suing the insured. *See Knotts*, 197 S.W.3d at 517; *see also Reeder*, 763 S.W.2d at 118.

Specifically, the KUCSPA prohibits insurers from engaging in any one of 14 unfair practices. Ky. Rev. Stat. § 304.12–230. In this case, plaintiff alleges that defendant violated the following subsections:

> (3) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
>
> (4) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
>
> * * *
>
> (6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; [and]
>
> * * *

> (14) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement[.]

*Id.* Mere technical violations of the statute do not in and of themselves constitute bad faith. *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993).

This is because, "[b]efore [a] cause of action [under the KUCSPA] exists in the first place, there must be evidence sufficient to warrant punitive damages," which requires proof that is "sufficient for the jury to conclude that there was conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Id.* (internal citation and quotation marks omitted). Moreover, "[m]ere negligent failure to settle within the policy limits or errors of judgment are insufficient to constitute bad faith." *Motorists*, 996 S.W.2d at 451 (citation omitted). Even evidence of a "failure to pay a claim in timely fashion" or "[i]nadvertence, sloppiness, or tardiness will not suffice; instead, the element of malice or flagrant malfeasance must be shown." *Bult*, 183 S.W.3d at 186. Plaintiff has not put forth sufficient evidence to satisfy this stringent threshold standard.

1.

Although plaintiff argues that defendant violated four separation subsections of the KUCSPA, the gravamen of plaintiff's complaint focuses on subsection 6. Ky. Rev. Stat. § 304.12–230(6). Plaintiff argues that defendant's settlement offer was not made in good faith because defendant knew plaintiff would not release and indemnify Yonts while plaintiff's civil action was pending, and yet defendant did not try to compromise by suggesting different terms. Progressive maintains that its duty was to protect its insured from an excess judgment while attempting in good faith to settle the claim, not simply to pay the policy limit.

Defendant has the better of the argument. Progressive began considering a settlement offer as soon as Yonts's criminal conviction established he was the driver responsible for Shaheen's death. When plaintiff demanded the full and unconditional payment of the policy limit, Progressive offered the $250,000 within a month, but in exchange for the full release and indemnification of its insured. In doing do, Progressive struck a balance between its competing duties of good faith—it made plaintiff an offer of the full policy limit in an attempt to settle the claim once "liability ha[d] become reasonably clear" while also protecting the interests of its insured by conditioning payment on a full release. Ky. Rev. Stat. § 304.12–230(6).

Kentucky law requires nothing more. The statute mandates that insurers make a good faith effort to reach a "fair and equitable" *settlement* of a claim "in which liability has become reasonably clear"—not simply to *pay* on such a claim. *Id.* Typically, a settlement results in the resolution and release of claims against a party. *See Settlement*, Black's Law Dictionary (10th ed. 2014) ("An agreement ending a dispute or lawsuit."). In this case, unconditionally paying plaintiff the full policy limit would have settled nothing, as Yonts would have remained a defendant indefinitely in plaintiff's civil action and vulnerable to an excess judgment.

And as the Supreme Court of Kentucky explained in *Motorists*, an insurer owes a duty to its insured "to protect him from a potential excess judgment" and can do so by "obtaining from [the claimant] a release of all claims against [the insured] in exchange for the payment of a liability settlement." 996 S.W.2d at 453 (citations omitted). Plaintiff's own expert witness, Dennis Boozer, acknowledged at his deposition that Progressive has "the obligation to their insured to attempt to get a release" and he thus did not "fault Progressive for offering policy limits in exchange for a release [because] that's protecting their insured."

Plaintiff asserts generally that defendant should have explored and offered alternative conditions of payment, such as a limited release or a covenant not to sue, but points to no authority requiring defendant to do so. Subsection 304.12–230(4), upon which plaintiff relies in this respect, "only requires that payment of a claim not be refused without conducting a reasonable investigation based on all available information[.]" *Motorists*, 996 S.W.2d at 454. This subsection speaks to an insurer's obligation to reasonably investigate *whether* to pay a claim, not *how* to pay it.

Here, plaintiff does not argue that Progressive's investigation of the underlying merits of his claim was unreasonable, or even that Progressive refused to pay the claim. Plaintiff suggests instead that defendant should have given him more options regarding the condition of payment, even if such options would have neither provided the same degree of liability protection for its insured nor relieved Progressive of its duty to defend him; and while that may have resolved the claim sooner, subsection 4 of the KUCSPA creates no such duty. Even if it did, there is no evidence that defendant's failure to propose alternative conditions of payment betrayed any malicious intent or evil motive.

Moreover, plaintiff had always demanded more than Progressive could offer. In his first demand letter, plaintiff made clear that he was seeking damages in excess of the policy limit. Plaintiff reiterated his position in his second letter. After being reminded by Yonts's defense counsel that Progressive's offer was still on the table, plaintiff again stated that the coverage was "grossly insufficient to cover the damages" and asserted that no settlement was possible unless "a substantial contribution is made (by the family, I presume) above policy limits." Progressive could not pay more than the policy limit, nor could it control whether or how much Yonts's

family would contribute. In sum, it is not "bad faith to refuse a demand to settle for a sum in excess of the policy limits." *Motorists*, 996 S.W.2d at 453 (citation omitted).

Progressive thus had a reasonable basis for insisting on a full release and indemnification for its insured rather than just paying the policy limit or offering a less protective condition of payment.

To the extent plaintiff argues that defendant, in bad faith, delayed making an offer or payment, we are not persuaded. Mere delay "does not amount to outrageous conduct" resulting in a finding of bad faith "absent [evidence of] some affirmative act of harassment or deception." *Motorists*, 996 S.W.2d at 452. In other words, there must be sufficient evidence to support "a reasonable inference that the *purpose* of the delay was to extort a more favorable settlement or to deceive the [claimant] with respect to the applicable coverage." *Id.* at 453 (emphasis added).

Here, there is no evidence of any affirmative act of harassment on Progressive's part. Nor is there any evidence from which to infer that Progressive deceived plaintiff or delayed paying him in order to extort a more favorable settlement. Indeed, defendant offered the full $250,000 promptly in response to plaintiff's request. Although plaintiff suggests that Progressive had all the facts it needed to evaluate and settle his claim only two days after the accident, presumably based on media reports, "[i]t certainly is not bad faith for an insurance company to undertake a full investigation, even if it believes it knows the facts." *Baymon v. State Farm Ins. Co.*, 257 F. App'x 858, 863 (6th Cir. 2007) (applying Kentucky law).

Nor does our decision in *Phelps* help plaintiff, as he contends. In *Phelps*, our court found sufficient evidence of lowball offers, delay tactics, and questionable claims-handling practices to meet the threshold inquiry. Specifically, we took issue with the defendant's initial $25,000 offer because it did not reasonably account for the plaintiff's pain and suffering and was only slightly

above the low end of the defendant's evaluation of the claim. 736 F.3d at 705. Moreover, the defendant unreasonably delayed payment by not making an initial claim valuation until it reviewed related medical records while making no effort to obtain those records for at least six months. *Id.* at 705–06. The defendant also repeatedly refused to disclose the policy limits or increase its offer without documentation of additional damages, changed claims adjusters four times without reason, and did not include facts in the claim file that would support a jury verdict in the plaintiff's favor. *Id.* at 706–07. Here, there is no evidence that Progressive made lowball offers, arbitrarily changed claims adjusters, undervalued the claim, disputed the value of the claim, failed to include certain facts in its claim file, withdrew its offer to pay the policy limit, or tried to deceive plaintiff regarding the policy limit. Progressive's conduct clearly does not rise to the level of the tactics and practices condemned in *Phelps*, and thus the circumstances of these cases are factually distinguishable.

Progressive made a fair and equitable settlement offer in light of its competing duties and held that offer open indefinitely. Plaintiff could have accepted at any time, but made a strategic decision to pursue his civil claims against Yonts and the other defendants. Settlement negotiations can involve delays and challenges, but an insurer's conduct must be *outrageous* to constitute bad faith—even evidence of a "negligent failure to settle within the policy limits," "errors of judgment," *Motorists*, 996 S.W.2d at 451 (citation omitted), or a "failure to pay a claim in timely fashion" is not enough, *Bult*, 183 S.W.3d at 186. Here, there is simply no evidence from which to reasonably infer that Progressive, by conditioning payment of the full policy limit on a full release and indemnification of its insured, was outrageous, recklessly indifferent to plaintiff's rights, or motivated by any malicious intent.

2.

Plaintiff alleges two other "technical" KUCSPA violations in support of his position that defendant's conditional settlement offer was made in bad faith. First, defendant violated subsection 14, requiring insurers to "promptly provide a reasonable explanation" for denying a claim, by not responding to his April 27, 2007, letter or explaining the basis of its offer. Second, defendant violated subsection 3, requiring insurers to "adopt and implement reasonable standards for the prompt investigation of claims," by failing to notify plaintiff when it supposedly made a liability decision on January 12, 2007, for not writing a more elaborate response to plaintiff's first demand letter, and for transferring the claims file to the legal department in April 2007 without first allowing the claims representative to consult with anyone in that department.

In short, plaintiff accuses defendant of not following some of its own policies to the letter. Plaintiff relies on Boozer's expert report and deposition testimony to establish that these actions constitute bad faith. Much of Boozer's report, however, speaks in conclusory fashion to plaintiff's position that defendant unfairly conditioned payment on the release and indemnification of its insured. At his deposition, Boozer specifically faulted defendant only for not making a settlement offer earlier in the process, and for not also considering "making a payment without a release."

In light of our discussion above, we agree with the district court that Boozer's reports and testimony do not reveal any conscious wrongdoing or recklessness on defendant's part. Even if Boozer's report and testimony were enough to show Progressive violated certain provisions of the KUCSPA, plaintiff must still satisfy Kentucky's threshold standard for bad faith claims against insurers. Plaintiff, however, has not, and nothing in Boozer's testimony or reports establishes otherwise. Bad faith "is not simply bad judgment. It is not merely negligence. It imports a dishonest purpose of some moral obliquity. It implies conscious doing of wrong [and]

[i]t partakes of the nature of fraud." *Matt v. Liberty Mut. Ins. Co.*, 798 F. Supp. 429, 433 (W.D. Ky. 1991), *aff'd* 968 F.2d 1215 (6th Cir. 1992). Boozer's criticisms may indicate areas where Progressive could improve its claims practices, but such evidence is an insufficient foundation upon which a jury could premise a finding of bad faith.

Under Kentucky law, an insurer must balance competing duties of good faith owed to its insured and to the party suing its insured. Plaintiff would have us upset this balance in his favor. We decline to do so in this case because, on the whole, plaintiff has not put forth enough evidence to support a reasonable inference that Progressive's conduct was so egregious that plaintiff is entitled to punitive damages. *See Bult*, 183 S.W.3d at 186 ("Absent such evidence of egregious behavior, [a] tort claim predicated on bad faith may not proceed to a jury."). Summary judgment in favor of Progressive was proper.

IV.

For the foregoing reasons, we affirm.